UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

UNIVERSITY HOUSE COMMUNITIES
GROUP, INC.,                          :

                                      :        **ECF CASE**

            Plaintiff,                :
                                      :        INDEX NO. <u>15-cv-6280</u>

      -against-                       :        **COMPLAINT**

GREGG SINGER and 9TH & 10TH STREET    :
LLC,                                  :        **JURY TRIAL DEMANDED**

            Defendants.               :

------------------------------------- X

University House Communities Group, Inc. ("UHC" or "Plaintiff"), by and through its

attorneys, brings this action against Gregg Singer and 9th & 10th Street LLC (collectively,

"Defendants") for injunctive relief and damages under the laws of the United States and of the

State of New York as follows:

## I.      NATURE OF THE ACTION

UHC hereby seeks injunctive relief and monetary damages against Defendants based on

Defendants' infringement of UHC's UNIVERSITY HOUSE trademark.  For over 14 years, UHC

and its predecessor in interest have used its incontestable federally registered and common law

mark UNIVERSITY HOUSE in connection with providing student housing and related services.

Defendants have recently adopted the name "University House" for a proposed project to

renovate property at 605 East Ninth Street, New York, New York 10009 into student housing.

Despite multiple demands from Plaintiff that Defendants cease using the UNIVERSITY HOUSE

mark in connection with Defendants' project, Defendants persist in their actions.  Defendants'

activities constitute trademark infringement, unfair competition, false designation of origin,

cyberpiracy, unfair trade practices, injury to business reputation and dilution, and

misappropriation, among other violations. As a result, Plaintiff has suffered, is suffering and, unless injunctive relief is entered by this Court, will continue to suffer ongoing irreparable harm due to Defendants' conduct alleged herein.

## II.    PARTIES

1.    UHC is a corporation duly organized and existing under the laws of the State of Delaware with a principal place of business at 3890 West Northwest Highway, Suite 601, Dallas, Texas 75220.

2.    Upon information and belief, Mr. Gregg Singer is an individual residing in New York, New York.

3.    9th & 10th Street LLC is a limited liability company duly organized and existing under the laws of the State of New York with a principal place of business at 605 East 9th Street, New York, New York 10009.

## III.    JURISDICTION AND VENUE

4.    This action arises under the Federal Trademark Act of 1946, known as the Lanham Act (15 U.S.C. §§1051-1127), and is for trademark infringement and unfair competition.

5.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§1331 and 1338 because this action involves claims by Plaintiff of trademark infringement, unfair competition and cyberpiracy arising under 15 U.S.C. §1114 and 15 U.S.C. §1125.

6.    This Court has supplemental jurisdiction over the claims in this Complaint that arise under the laws of the State of New York pursuant to 28 U.S.C. §1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2

7.     Defendants are subject to personal jurisdiction in this district because they are domiciled in the State of New York, conduct continuous, systematic, and routine business within the State of New York, and have purposefully directed their unlawful acts at the State of New York.

8.     Venue lies properly in this Court pursuant to 28 U.S.C. §1391(b)(1) because, under 28 U.S.C. §1391(c), Defendants are deemed to reside in this district and they are subject to personal jurisdiction in this district at the time the action commenced.

9.     Venue is also proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## IV.     FACTS GIVING RISE TO THIS ACTION

### A.     UHC's Business Activities

10.     UHC is a development, acquisition and management firm dedicated to the creation of student housing communities in university markets across the United States.

11.     UHC is an innovative advocate, developer, principal and partner in building and operating university communities on and off campuses nationwide.  Its approach in the student housing arena involves substantial long-term investments in carefully chosen markets, working in partnership with the local university to enhance the university community environment with innovative, off-campus housing.

12.     In developing a student housing project, UHC provides site selection, deal sourcing, underwriting and valuation, legal, physical and financial due diligence, third-party coordination, debt financing, closing coordination, project design construction, risk management and marketing/advertising services.  Its projects are noted for their quality construction and desirable locations.

13.     After a project is built, UHC provides management services including pre-leasing, budget development and management, marketing/advertising, staffing and training facilities, maintenance, operations, leasing and residence life management services.  Its management services are designed to increase asset performance and longevity while also providing an exceptional and safe living and learning experience for student residents.

14.     UHC's university investments are developed in concert with the objectives of the local universities and communities to provide the ultimate living and learning experience to students.  UHC builds relationships, rapport and consensus with the primary constituencies in each geographic market, including university personnel, local government officials, community leaders and neighbors, competitors, construction and design teams, financial partners and others who are critical to the success of new university community developments.

15.     UHC's communities are innovative and provide the ultimate living and learning experience for students.  UHC is committed to the highest quality of materials, management and maintenance of its properties to sustain and grow the value of its assets and has a history of being a long-term holder of its real estate assets.  UHC incorporates the very best of residential student living units and cutting-edge amenities, including resort-style pools with cabanas, Internet study bars with computer stations and proximity to campus, as well as shopping, restaurants and other retail establishments.

16.     UHC is one of the largest owners of student housing properties in the United States.  UHC currently owns and operates fifteen purpose-built student housing facilities in twelve states, consisting of more than 3,000 units and 8,200 beds.  UHC currently employs over 138 full time employees focused solely on the development, acquisition and management of student housing properties.

17.    UHC has aggressive plans for expansion into additional territories across the United States, and currently has projects providing an additional 2,450 beds under construction.

**B.    UHC'S Valuable "UNIVERSITY HOUSE" Trademark**

18.    UHC's university communities provide luxury housing to non-resident and non-local students on and off university campuses across the United States.  UHC actively markets its university residences throughout the United States to students (and their parents) who may be attending one of the universities associated with a project.

19.    The university communities which UHC develops, acquires and manages and the services which it provides in connection therewith are marketed nationally under the trademark and trade name UNIVERSITY HOUSE (the "UNIVERSITY HOUSE Mark").  UHC uses the UNIVERSITY HOUSE Mark in advertisements specifically targeting students and prospective students, and their parents, through various nationally distributed media.

20.    Some of the UHC university communities incorporate the mark UNIVERSITY HOUSE in their trade name, such as University House in Tempe located near the University of Arizona.

21.    Since at least as early as November 20, 2002, UHC's and its predecessor in interest's services have been advertised under the UNIVERSITY HOUSE mark on a website at <universityhouse.com> which provides detailed information regarding UHC's student housing offerings including information about its university community locations and amenities.  This website incorporates specific webpages for each of UHC's UNIVERSITY HOUSE student community locations.  A true and correct screenshot of a resident webpage depicting one of the residences is attached hereto as **Exhibit A**.  These webpages may be accessed by residents and/or prospective residents of a UNIVERSITY HOUSE student community, as well as any other interested individuals, from any geographic location with an Internet connection where such

users may happen to be located within the United States and elsewhere including, for example, New York.

22.     The resident webpages referenced above also allow residents, or financially responsible individuals, such as a student's parents, to pay rent online. These webpages likewise may be accessed and payments made from any geographic location with an Internet connection where such users may happen to be located within the United States and elsewhere including, for example, New York.

23.     UHC is the exclusive owner of a federal trademark registration registered with the United States Patent & Trademark Office ("USPTO") for the UNIVERSITY HOUSE Mark, United States Trademark Registration No. 2660252 (the "UNIVERSITY HOUSE Registration") for real estate housing, multi-family property management, real estate investment and real estate brokerage services. The application for this registration was filed on June 19, 2000. A copy of the certificate of registration for this mark is attached hereto as **Exhibit B**.

24.     The UNIVERSITY HOUSE Registration is valid, subsisting and in full force. Pursuant to 15 U.S.C. §1115(b), the UNIVERSITY HOUSE Registration is incontestable and, therefore, this registration provides conclusive evidence of the registration, validity and ownership of, and UHC's exclusive rights to use, the UNIVERSITY HOUSE Mark.

25.     In addition to the UNIVERSITY HOUSE Registration, UHC owns common law rights in the UNIVERSITY HOUSE Mark, both on its own and in combination with the letters UH as shown on the homepage of UHC's website at <universityhouse.com> (the "UNIVERSITY HOUSE Logo"). A true and correct screenshot of the homepage of the <universityhouse.com> website is attached hereto as **Exhibit C**.

26.     The UNIVERSITY HOUSE Mark has been used by UHC and its predecessor in interest continuously for over 14 years in connection with real estate leasing, multi-family

property management, real estate investment and real estate brokerage services, which includes building and operating university communities on and off campuses nationwide.

27.     UHC and its predecessor in interest have expended substantial effort and significant sums of money in promoting, advertising and enforcing the UNIVERSITY HOUSE Mark and the UNIVERSITY HOUSE Logo nationwide.

28.     By virtue of UHC's longstanding use and significant promotional efforts, the UNIVERSITY HOUSE Mark and the UNIVERSITY HOUSE Logo have become associated exclusively with UHC.

### C.     Defendants' Unlawful Conduct

29.     According to the websites located at <university-house.info> and <universityhousenyc.rentaladdress.com>, Defendants are developing a dormitory residence at 605 East Ninth Street, New York, New York 10009 (the "Dormitory").

30.     Upon information and belief, Defendants intend to offer student housing services at the Dormitory and are engaged in leasing services for the Dormitory (the "Infringing Services") under the designation UNIVERSITY HOUSE (the "Infringing Mark").

31.     The Dormitory has been under construction since approximately 2004, though the project has been halted from time to time due to various factors.  Defendants had at least constructive notice of Plaintiff's federal trademark rights in the UNIVERSITY HOUSE Mark at the time construction began.  Defendants are not currently offering student housing services at the site.

32.     Nonetheless, Defendants are actively marketing the Dormitory by soliciting various parties to master lease a portion of the Dormitory on a multi-year basis.

33.     Defendants registered the domain name <university-house.info> on or around September 25, 2008, which domain name incorporates verbatim the federally registered UNIVERSITY HOUSE Mark.

34.     Defendants registered the domain name <universityhousenyc.com> on or around December 20, 2013, which domain name incorporates verbatim the federally registered and, by that time, incontestable UNIVERSITY HOUSE Mark.

35.     Defendants registered the domain name <liveuniversityhouse.com> on or around January 25, 2014, which incorporates verbatim the federally registered and incontestable UNIVERSITY HOUSE Mark at a time when Defendants knew that UHC objected to their use of a mark or domain name incorporating any mark confusingly similar to the UNIVERSITY HOUSE Mark, as alleged below.

36.     Defendants registered the domain name <universityhouse.nyc> on or around October 8, 2014, which incorporates verbatim the federally registered and incontestable UNIVERSITY HOUSE Mark at a time when Defendants knew that UHC objected to their use of a mark or domain name incorporating any mark confusingly similar to the UNIVERSITY HOUSE Mark, as alleged below.

37.     Defendants are actively marketing their Infringing Services at the websites <university-house.info> and <universityhousenyc.rentaladdress.com>.  Defendants control, own, maintain and/or operate the websites associated with these domain names.  True and correct screenshots of the homepages of these websites are attached hereto as **Exhibit D**.

38.     The Infringing Mark is confusingly similar to the UNIVERSITY HOUSE Mark. The spelling and pronunciation of the respective marks are identical.  Further, the respective marks are used in connection with the same or substantially similar services.

39.     Upon information and belief, Defendants adopted the Infringing Mark and began soliciting leases in connection with the Infringing Services under the Infringing Mark long after UHC and its predecessor in interest established rights in the UNIVERSITY HOUSE Mark.

40.     Upon information and belief, Defendants deliberately adopted the Infringing Mark to evoke the UNIVERSITY HOUSE Mark, and thereby intended to create confusion in the minds of the relevant public as to the origin of Defendants' business activities.

41.     Defendants have exacerbated this likelihood of confusion through the nature and manner of their use of the Infringing Mark on the websites at <university-house.info> and <universityhousenyc.rentaladdress.com>.   The look and feel of these uses evoke the content of UHC's website <universityhouse.com>.   Further, Defendants use the Infringing Mark coupled with the abbreviation "UH" on the homepage of the websites.   Defendants' logo is likewise extremely similar to, and evocative of, the UNIVERSITY HOUSE Logo shown on Exhibit C attached hereto.   True and correct screenshots of Defendants' <university-house.info> and <universityhousenyc.rentaladdress.com> websites displaying the Infringing Mark alongside the abbreviation "UH" is attached hereto as **Exhibit E**.

42.     Defendants' attempt to develop the Dormitory in connection with the Infringing Mark has been met with extensive negative press and publicity.   Indeed, there have been numerous articles dating back to at least 2004 discussing many of the problems with Defendants' development plans.

43.     As a result of community opposition, among other things, Defendants' development of the Dormitory has not yet been completed and the Dormitory is not currently open for business.

44.     In the December 22-28, 2004 edition of *The Villager* in an article entitled "Buildings nixes E. 9th St. I-can't-believe-it's-a-dorm dorm" on the website <thevillager.com>,

9

it was reported that "[d]ealing a blow to Gregg Singer's plan to build a 222-room, 19-story dormitory on the site of the old P.S. 64/former CHARAS/El Bohio community and cultural center on E. Ninth St., the Department of Buildings last week disapproved the plans the developer submitted for the project.  Like the project's opponents, D.O.B. was unconvinced that the building as planned would actually be a dormitory."  A true and correct copy of this article is attached hereto as **Exhibit F**.

45.     In the August 24-30, 2005 edition of *The Villager* in an article entitled "Gregg Singer pleads his case for his 19-story 'Acme dorm'" on the website <thevillager.com>, it was reported that "nearly 100 opponents packed the hearing room of the city's Board of Standards and Appeals on Aug. 16 to protest developer Gregg Singer's dogged efforts to demolish the rear of the old P.S. 64 school at 605 E. Ninth St. in order to put up a 19-story dormitory."  It was further reported that "Roland Legiardi-Laura of the East Village Community Coalition — a group that spans Christodora condo owners, old-time homesteaders, former squatters and concerned renters — complained that since Singer took over the building it had become a "rotting corpse." He has purposely left the building's windows broken. There are mounds of pigeon dung of up to 2 feet," Legiardi-Laura claimed." A true and correct copy of this article is attached hereto as **Exhibit G**.

46.     A February 21, 2013 article entitled "Dorm project upsets East Village residents" at *The Real Deal: New York Real Estate News* on the website <therealdeal.com>, stated that "[Carolyn] Ratcliffe, a former Community Board 3 member, questioned the intentions of [Gregg] Singer, who has owned the building [located at 605 E. Ninth St.]  since 1998. 'He has not been a good neighbor in the past,' she told the Local. Singer and the project's architect declined the Local's request for comment; the developer has tried to convert the school into a dormitory

10

before but backed off his plans because of neighborhood opposition."     A true and correct copy of this article is attached hereto as **Exhibit H**.

47.     A February 21, 2013 article entitled "Resistance Brewing Over Conversion of Former P.S. 64 Into Dorms" published by *The Local East Village* on the website <eastvillage.thelocal.nytimes.com>, reported that "Andrew Berman, executive director of the Greenwich Village Society for Historic Preservation, was among the preservationists and politicians who pushed for the 107-year-old school building to receive landmark status. 'Given the owner's awful record in terms of past plans for the building and his horrible stewardship of this landmark property, we will be keeping a very close eye on any new plans he pursues,' he told The Local this week," and "[f]or now, the organization's former home remains vacant. Tuesday night, a reporter heard clanging noises coming from the top of the five-story structure. [Carolyn] Ratcliffe [a member of the Ninth Street Block Association] worried that large pieces of metal hanging from the building could fall and harm passersby. She said she had voiced complaints to Council Member Rosie Mendez and others about the state of disrepair."  A true and correct copy of this article is attached hereto as **Exhibit I**.

48.     An April 29, 2013 article entitled "University House Opens for Students Attending College in New York City" published in New York University's Independent Daily Student Newspaper *Washington Square News* on the website <nyunews.com>, reported that New York University expressly chose not to partner with Defendant with respect to any lease arrangement, stating that "NYU will have no involvement with this new housing.  'For a range of reasons, including our understanding of the long history of the community wanting that space for a non-dorm use, we have no interest,' said Philip Lentz, NYU's director of public affairs."  A true and correct copy of this article is attached hereto as **Exhibit J**.

49.     A December 20, 2013 article entitled "What's Up With that Rotting School on East 9th Street?" at *Off the Grid: The Blog of the Greenwich Village Society for Historic Preservation* on the website <gvshp.org>, stated that "if only Mayor Rudy Giuliani's administration hadn't auctioned off P.S. 64 to a private buyer back in the sultry days of July, 1998 … [t]wo residential blocks — East 9th Street and East 10th Street, between Avenues B and C — would not be blighted by a large, empty, decaying building: a construction site with little construction, because the developer has not moved forward in a substantive way."   The article further stated that "[t]he most unbiased observer would have a hard time saying that owner Gregg Singer, who bought the property for $3.15 million in 1998, has been a responsible owner or has realized the highest and best use of the property. After numerous false starts, demolitions and DOB violations, Singer this fall posted a website touting a dorm called University House, to open for the 2015/16 school year, although according to the Department of Buildings website he has filed none of the documents necessary to do so."   A true and correct copy of this article is attached hereto as **Exhibit K**.

50.     In the August 28, 2014 edition of *The Villager* on the website <thevillager.com>, an article entitled "Dorm plans O.K.'d for former CHARAS; Mendez vows to fight" reported that "[e]ver since he bought the old, decommissioned school building at city auction in 1998 for $3.2 million, [Gregg] Singer has faced staunch opposition from local politicians and community activists who want the building returned to use as a community center."   A true and correct copy of this article is attached hereto as **Exhibit L**.

51.     A September 24, 2014 article entitled "City Halts Conversion of Former Public School Into Cooper Union Dorms" published by DNAinfo on the website <dnainfo.com>, reported that "[t]he [Department of Buildings] issued a partial stop work order at the former P.S. 64 building on East Ninth Street near Avenue B Tuesday, records show. The department found

that the developer [Gregg Singer] was not complying with zoning regulations, a spokesman said," and "[c]ommunity groups and elected officials have strongly opposed the dormitory, saying the building should be preserved as a community space instead." A true and correct copy of this article is attached hereto as **Exhibit M**.

52.     A September 25, 2014 post on an Internet blog entitled *Curbed* located at the website <ny.curbed.com>, stated "Developer Gregg Singer's plans to convert the historic P.S. 64 on East 10th Street into a dorm have been halted by the Department of Buildings. A Stop Work Order was issued because the department found that Singer provided the agency with misinformation." A true and correct screenshot of this blog is attached hereto as **Exhibit N**.

53.     A January 2, 2015 post on an Internet blog entitled *Curbed* located at the website <ny.curbed.com>, stated "Community members are tired of the landmarked P.S. 64 on East 9th Street sitting vacant.  The community is rallying behind a petition led by councilmember Rosie Mendez to return the building to the neighborhood.  Most recently, developer Gregg Singer planned to convert the structure into dorms, but the DOB pulled the plug on the effort in September.  The building has now been sitting vacant for over 13 years." A true and correct screenshot of this blog is attached hereto as **Exhibit O**.

54.     A January 2, 2015 post on an Internet blog entitled EV GRIEVE located at the website <evgrieve.com>, stated "Back in September, the Department of Buildings put a stop, for now, to developer Gregg Singer's plans to convert the long-empty building between Avenue B and Avenue C into a dorm.  City Councilmember Rosie Mendez's office recently launched an online petition asking Mayor de Blasio to return the building to the community." A true and correct copy of this post is attached hereto as **Exhibit P**.

55.     A January 7, 2015 article entitled "Three Kings Travel to City Hall to Protest Dorming of P.S. 64 Building" published by Bedford and Bowery on the website

<bedfordandbowery.com>, stated "Mayor de Blasio received an unusual gift on Three King's Day when picketers gathered outside City Hall to protest the loss of a beloved East Ninth Street community center."  A true and correct copy of this article is attached hereto as **Exhibit Q**.

56.    As detailed in the above-referenced representative articles, Defendants' controversial development of the Dormitory has been met with years of intense community opposition, as well as public accusations that Gregg Singer provided local authorities and the Department of Buildings with misinformation about the Dormitory, among other things.  In light of this widespread negative publicity,  Defendants' unauthorized use of the Infringing Mark in connection with the Dormitory has damaged the affirmative associations and extensive goodwill associated with Plaintiff's UNIVERSITY HOUSE Mark, and has diminished and will continue to diminish the strong reputation and commercial value of Plaintiff's UNIVERSITY HOUSE Mark.

57.    Defendants' use of the Infringing Mark on such a highly controversial and criticized project also dilutes Plaintiff's UNIVERSITY HOUSE Mark.

58.    Shortly after learning of Defendants' unauthorized use of the Infringing Mark, Plaintiff, through its counsel, sent multiple letters to Defendant Singer dated January 9, 2014; February 3, 2014; February 13, 2014; February 20, 2014; and March 18, 2014 objecting to Defendants' use of the Infringing Mark.

59.    Defendants did not respond to Plaintiff's multiple correspondence to reach them until Ms. Donna L. Mirman, counsel for Defendants, sent a letter to Plaintiff's counsel dated March 27, 2014 stating that she was reviewing Plaintiff's correspondence and would respond in due course.

60.    Over two months went by with no further follow up from Ms. Mirman. Defendants' counsel finally provided a substantive response dated June 11, 2014, wherein she

stated that Defendants would not comply with Plaintiff's demands to cease use of the Infringing Mark.

61.     Notwithstanding Defendants' constructive notice of Plaintiff's prior trademark rights in the UNIVERSITY HOUSE Mark, through the UNIVERSITY HOUSE Registration and otherwise, and Defendants' actual notice of Plaintiff's prior trademark rights, Defendants continue to use the Infringing Mark in connection with the development and marketing of the Dormitory.

62.     Defendants' use of the Infringing Mark, including use on the Internet, in a manner that mimics Plaintiff's use of its registered mark, has raised a likelihood of confusion and has harmed Plaintiff among those consumers, particularly those living in New York, who have considered leasing Plaintiff's residences for students enrolled at universities proximate to one of the UHC university residence projects.

63.     Defendants' development of the Dormitory has been halted more than once, however, it has been recently reported that work on the project may resume and that the Dormitory may open in September 2015, according to the website at <universityhousenyc.rentaladdress.com>, or in 2016/2017, according to the website at <university-house.info>.  If this project becomes active, Defendants' use of the Infringing Mark is likely to increase.  Further, as Plaintiff develops more properties along the East Coast, the probability for increased incidents of actual confusion will increase unless Defendants' unauthorized use of the UNIVERSITY HOUSE Mark is stopped.

64.     Defendants' continued use of the Infringing Mark is without any permission or license from UHC, is unfair, misleads and deceives or is likely to mislead or deceive the public, dilutes the unique nature of the UNIVERSITY HOUSE Mark, and has caused and, until

enjoined, will continue to cause irreparable injury to UHC's goodwill, identity, and reputation, for which UHC has no adequate remedy at law.

## COUNT I
## FEDERAL TRADEMARK INFRINGEMENT
## (15 U.S.C. §§1114)

65. Plaintiff realleges paragraphs 1 through 64 as if fully set forth herein.

66. The UNIVERSITY HOUSE Registration is valid and incontestable.  UHC has built substantial public recognition in and to the UNIVERSITY HOUSE Mark under which it does business in interstate commerce.

67. Defendants' use of the Infringing Mark is likely to cause confusion, mistake or to deceive the public as to the affiliation, connection or association of Defendants and their services with those of UHC because Defendants' use and threatened continued use of the Infringing Mark constitutes "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services," in violation of 15 U.S.C. §1114(1)(a).

68. Defendants' use and threatened continued use of the Infringing Mark is likely to cause confusion, mistake and/or deception of consumers as to the source, origin or sponsorship of services, in violation of the Lanham Act including, but not limited to, 15 U.S.C. §1114.

69. Defendants' use of the Infringing Mark infringes upon UHC's federally-protected trademark rights.

70. Defendants continue to knowingly and willfully infringe upon UHC's rights in the UNIVERSITY HOUSE Mark, despite being put on actual notice of UHC's rights and its objections.

71. The goodwill of UHC's business under the UNIVERSITY HOUSE Mark is of great value and, by reason of Defendants' acts alleged herein, UHC has suffered and will suffer

damage to its business, reputation and goodwill.  UHC will suffer irreparable harm should Defendants' infringement be allowed to continue to the detriment of UHC's trade reputation and goodwill for which damage UHC cannot be adequately compensated at law.

72.     Defendants' continued and escalating violations of 15 U.S.C. §1114 have caused and, unless enjoined by this Court, will continue to cause irreparable injury to UHC that is not fully compensable in monetary damages.  UHC cannot ascertain the amount of compensation which would afford it adequate relief for such continuing acts.  UHC is therefore entitled to an injunction enjoining and restraining Defendants from use of the UNIVERSITY HOUSE Mark, or any other mark that is confusingly similar to UHC's UNIVERSITY HOUSE Mark.

73.     UHC is informed and believes and on that basis alleges that Defendants have derived unlawful gains and profits from its infringement of the UNIVERSITY HOUSE Mark. UHC has suffered and will suffer the loss of sales and profits that UHC would have made but for Defendants' acts.

74.     Defendants have engaged in acts of infringement, with knowledge of UHC's exclusive rights in and to the UNIVERSITY HOUSE Mark, and with intent to cause confusion and unlawfully benefit therefrom.  Defendants continue in such acts of intentional infringement, thus entitling UHC to an award of treble its actual damages, Defendants' profits, plus attorneys' fees and costs in bringing and maintaining this action, pursuant to 15 U.S.C. §1117.

## COUNT II
## FEDERAL UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN
## (15 U.S.C. §1125(A))

75.     Plaintiff realleges paragraphs 1 through 74 as if fully set forth herein.

76.     Defendants' use and threatened continued use of the UNIVERSITY HOUSE Mark constitutes unfair competition, and a false designation of origin or a false or misleading description or representation of fact, which is likely to deceive customers and prospective

customers into believing that Defendants' services are those of UHC, in violation of §43(a) of the Lanham Act, 15 U.S.C. §1125(a).

77.     Defendants' actions are likely to cause confusion or mistake among the public as to the true origin and sponsorship of Defendants' services, and to confuse the public into believing that Defendants' services have the approval of UHC, or are otherwise affiliated, connected, associated with, or sponsored by UHC, in violation of §43(a) of the Lanham Act, 15 U.S.C. §1125(a).

78.     The goodwill of UHC's business under the UNIVERSITY HOUSE Mark is of great value, and UHC will suffer irreparable harm should Defendants' acts of unfair competition, and false representation and designation, be allowed to continue, to the detriment of UHC's trade reputation and goodwill for which damage UHC cannot be adequately compensated at law.

79.     UHC has no control over the quality of the services offered by Defendants.  All of the community ill will associated with Defendants' dilapidated and ill-maintained property is likely to be associated with UHC because of the identity of the Infringing Mark and UHC's UNIVERSITY HOUSE mark.  Unless enjoined by this Court from so doing, Defendants will continue to engage in their acts of unfair competition, false representation and designation, to the irreparable damage and injury of UHC.

80.     Defendants' continued and escalating violations of 15 U.S.C. §1125(a) have caused and, unless enjoined by this Court, will continue to cause irreparable injury to UHC that is not fully compensable in monetary damages.  UHC cannot ascertain the amount of compensation which would afford it adequate relief for such continuing acts.  UHC is therefore entitled to an injunction enjoining and restraining Defendants from use of the UNIVERSITY HOUSE Mark or any other mark that is confusingly similar to the UNIVERSITY HOUSE Mark.

18

81.     UHC is informed and believes and on that basis alleges that Defendants have derived unlawful gains and profits from its infringement of the UNIVERSITY HOUSE Mark. UHC has suffered and will suffer the loss of sales and profits that UHC would have made but for Defendants' acts.

82.     Defendants have engaged in acts of unfair competition, false representation and designation, with knowledge of UHC's exclusive rights to the UNIVERSITY HOUSE Mark, and Defendants continue in such acts of unfair competition, intentional false representation and designation, thus entitling UHC to an award of treble its actual damages, Defendants' profits, plus attorneys' fees and costs in bringing and maintaining this action, pursuant to §35(b) of the Lanham Act, 15 U.S.C. §1117(b).

**COUNT III**
**CYBERPIRACY**
**(15 U.S.C. §1125(D))**

83.     Plaintiff realleges paragraphs 1 through 82 as if fully set forth herein.

84.     Plaintiff, by virtue of its prior and continuous use of the UNIVERSITY HOUSE Mark and its ownership of the UNIVERSITY HOUSE Registration, is the owner of the UNIVERSITY HOUSE Mark which was distinctive at the time that Defendants registered the domain names <universityhousenyc.com>, <universityhouse.nyc>, <liveuniversityhouse.com>, <university-house.info> and <universityhousenyc.rentaladdress.com>.  The domain names <universityhousenyc.com> (the "Defendants' Former Domain"), and <liveuniversityhouse.com> and <universityhouse.nyc> (collectively, the "Defendants' Inactive Domains") no longer direct to active websites.  Defendants still operate websites under the domain names <university-house.info> and <universityhousenyc.rentaladdress.com>.

85.     The        domain        names        <university-house.info>        and <universityhousenyc.rentaladdress.com>, the Defendants' Inactive Domains and the Defendants'

Former Domain are nearly identical to or confusingly similar to the UNIVERSITY HOUSE Mark.

86.     Defendants registered the Defendants' Inactive Domains and the Defendants' Former Domain, and have registered and are using the domain names <university-house.info> and <universityhousenyc.rentaladdress.com>, with a bad faith intent to profit from UHC's UNIVERSITY HOUSE Mark in violation of the Anticybersquatting Consumer Protection Act (1999), 15 U.S.C. §1125(d)(1)(A).

87.     Unless permanently enjoined by this Court, Defendants will continue their registration of the Defendants' Inactive Domains and their registration and use of the domain names <university-house.info> and <universityhousenyc.rentaladdress.com> with a bad faith intent to profit from UHC's valuable mark, thereby causing injury to UHC.  There is no adequate remedy at law for the harm that UHC has and will continue to incur, and the actions of Defendants have irreparably and otherwise injured UHC.

88.     As a result of Defendants' registration of the Defendants' Former Domain and the Defendants' Inactive Domains, and their registration and use of the domain names <university-house.info> and <universityhousenyc.rentaladdress.com>, UHC has suffered damages in an amount to be determined at trial.

89.     Accordingly, UHC is entitled to the transfer of the domain name <university-house.info> and the Defendants' Inactive Domains or, in the alternative, to the forfeiture or cancellation of these domain names and the domain name <universityhousenyc.rentaladdress.com>, pursuant to 15 U.S.C. §1125(d)(1)(C).

<u>COUNT IV</u>
<u>INJURY TO BUSINESS REPUTATION AND DILUTION UNDER NEW YORK</u>
<u>STATE LAW</u>
<u>(N.Y. GEN. BUS. LAW §360-1)</u>

90.     Plaintiff realleges paragraphs 1 through 89 as if fully set forth herein.

91.     UHC's UNIVERSITY HOUSE Mark is of distinctive quality and has acquired secondary meaning and fame in the marketplace.

92.     Defendants' use and threatened continued use of the Infringing Mark constitutes tarnishment of the affirmative associations that the Plaintiff's UNIVERSITY HOUSE Mark has come to convey, and has diminished and will continue to diminish the reputation and commercial value of the UNIVERSITY HOUSE Mark.  Defendants' use of the Infringing Mark is likely to dilute the distinctive quality of UHC's UNIVERSITY HOUSE Mark, and to lessen the capacity of such mark to identify and distinguish its services from those of others, including Defendants.

93.     Defendants are liable to UHC for violations of N.Y. Gen. Bus. Law §360-l.

94.     As a direct and proximate result of the foregoing acts, UHC has been damaged and has suffered, and will continue to suffer, significant damages, in an amount to be proven at trial.  Defendants have engaged in the foregoing acts with knowledge of UHC's exclusive rights in and to the UNIVERSITY HOUSE Mark, and with intent to cause confusion and to unlawfully benefit therefrom, thus entitling UHC to an award of treble its actual damages, Defendants' profits, plus attorneys' fees and costs in bringing and maintaining this action, pursuant to N.Y. Gen. Bus. Law §360-m.

95.     Defendants continued violations of N.Y. Gen. Bus. Law §360-l have caused and, unless enjoined by this Court, will continue to cause irreparable injury to UHC that is not fully compensable in monetary damages.  UHC cannot ascertain the amount of compensation which would afford it adequate relief for such continuing acts.  UHC is therefore entitled to an

injunction enjoining and restraining Defendants from use of the UNIVERSITY HOUSE Mark or any other mark that is likely to dilute the UNIVERSITY HOUSE Mark.

## COUNT V
## TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER NEW YORK STATE COMMON LAW

96.    Plaintiff realleges paragraphs 1 through 95 as if fully set forth herein.

97.    UHC has a property interest in its name, reputation and goodwill which UHC, at significant expense, has built up through its use, advertising and promotion of the UNIVERSITY HOUSE Mark.

98.    Defendants' adoption and use of the Infringing Mark, as alleged above, constitutes deliberate and bad faith copying of Plaintiff's UNIVERSITY HOUSE Mark, which misappropriates the goodwill owned in the UNIVERSITY HOUSE Mark, and is likely to confuse, mislead, or deceive the relevant consuming public into believing that Defendants' products and services are associated with or related to Plaintiff.  The conduct of Defendants is commercially immoral and constitutes an attempt to profit from the labor, skill, expenditures, name and reputation of UHC.

99.    As a direct and proximate result of the foregoing acts, Defendants unlawfully derived, and will continue to derive, income, profits, and ever-increasing goodwill from their activities, and Plaintiff has been damaged and has suffered, and will continue to suffer, significant damages, in an amount to be proven at trial.

100.    Money damages alone cannot fully compensate Plaintiff for Defendants' misconduct.  Unless Defendants are enjoined by the Court, they will continue to engage in common-law trademark infringement and unfair competition as alleged above, thereby causing irreparable injury to Plaintiff and its business identity, goodwill, and reputation.  Plaintiff is

therefore entitled to an injunction restraining and enjoining Defendants from using the Infringing

Mark or any other mark confusingly similar to the UNIVERSITY HOUSE Mark.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays:

A.    That the Court enter judgment against Defendants as indicated below:

i.    Issuing injunctive relief:

(a)    Enjoining and restraining Defendants and their officers, agents, representatives, servants, employees, attorneys, successors and assigns from directly or indirectly using the Infringing Mark or any other mark or designation that is confusingly similar to the UNIVERSITY HOUSE Mark;

(b)    Ordering that all labels, signs, stationery, business cards, promotional materials and advertisements in the possession of the Defendants bearing the Infringing Mark shall be delivered up and destroyed, all at Defendants' cost;

(c)    Ordering Defendants to recall and destroy any advertising or promotional material bearing the Infringing Mark or any other mark confusingly similar to the UNIVERSITY HOUSE Mark in any and all media including, but not limited to, letterhead, business cards, newspapers, flyers, coupons, promotions, signs, telephone books, telephone directory assistance listings, the Internet, websites and mass mailings, all at Defendants' cost;

(d)    Ordering the transfer of Defendants' domain name <university-house.info> and the Defendants' Inactive Domains to UHC, along with

any other name owned or registered by either Defendant and/or their officers, agents, representatives, servants, employees, attorneys, successors and assigns that consists of, is similar to or contains the UNIVERSITY HOUSE Mark or, in the alternative, order the forfeiture or cancellation of the domain name <university-house.info>, the domain name <universityhousenyc.rentaladdress.com> and the Defendants' Inactive Domains, and any other domain name or subdomain name that consists of, is similar to, or contains the UNIVERSITY HOUSE Mark;

(e)     Requiring Defendants to publish notice to all customers, potential customers or members of the trade who may have seen or heard of Defendants' use of the Infringing Mark, the domain name <university-house.info>, the domain name <universityhousenyc.rentaladdress.com>, the Defendants' Inactive Domains or the Defendants' Former Domain, which notice shall disclaim any connection with UHC and shall advise them of the Court's injunction order and of Defendants discontinuance from all use of the Infringing Mark and the domain name <university-house.info>, the domain name <universityhousenyc.rentaladdress.com>, the Defendants' Inactive Domains and the Defendants' Former Domain;

(f)     Requiring Defendants to provide UHC a full and complete accounting of all amounts due and owing to UHC as a result of Defendants' illegal activities;

(g)     Ordering Defendants to account for and hold in trust, as constructive trustees for the benefit of UHC, their profits obtained from its solicitation of the Dormitory and its offering of the Infringing Services under the

Infringing Mark, the domain name <university-house.info>, the domain name <universityhousenyc.rentaladdress.com>, the Defendants' Inactive Domains or the Defendants' Former Domain; and

(h)    Ordering Defendants to file with the Court and to serve upon UHC's undersigned counsel within thirty (30) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order.

B.    That the Court enter final judgment ordering Defendants to pay UHC 's general, special, actual, and statutory damages as may be allowed by the following:

(a)    The costs of corrective advertising;

(b)    UHC's damages;

(c)    Defendants' profits trebled for Defendants' willful violation of UHC's UNIVERSITY HOUSE Mark;

(d)    The costs of this action and the reasonable attorneys' fees incurred by it in prosecuting this action; and

(e)    Such other and further relief as it shall deem just and necessary.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury for all causes and issues so triable.

Dated: New York, New York.
August 10, 2015

Respectfully submitted,

**UNIVERSITY HOUSE COMMUNITIES GROUP, INC.**

By: /s/ Tamar Y. Duvdevani
   Tamar Y. Duvdevani
   Marc E. Miller
   **DLA Piper LLP (US)**
   1251 Avenue of the Americas
   New York, New York 10020-1104
   212.335.4500

   Monica L. Thompson*
   Christina L. Martini*
   Virginia Wolk Marino*
   **DLA Piper LLP (US)**
   203 North LaSalle Street
   Suite 1900
   Chicago, IL 60601-1293
   312.368.4000

   * - *Pro hac vice* application anticipated

   *Attorneys for Plaintiff*
   *University House Communities Group, Inc.*